IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| United States <u>ex rel.</u> Steve Greenfield, | § § § § § | On Appeal From An Order of the U.S. District Court for the District Of New Jersey |
| APPELLANT, | | |
| v. | § § § | Appeal Docket No. 17- 1152 |
| Medco Health Solutions, Inc., Accredo Health Group, Inc., and Hemophilia Health Services, Inc., | § § § § | Civil Action Pursuant to The False Claims Act 31 U.S.C. et seq. |
| APPELLEES | § § | |

# REPLY BRIEF OF THE APPELLANT, STEVEN GREENFIELD

**BEGELMAN & ORLOW, P.C.**
By:   Marc M. Orlow
        Regina D. Poserina
        Ross Begelman
411 Route 70 East, Suite 245
Cherry Hill, NJ 08034
(856) 428-6020
fax: (856) 428-5485
Email: marc.orlow@begelmanorlow.com
          Regina.poserina@begelmanorlow.com

## <u>TABLE OF CONTENTS</u>

I.    ACCREDO OFFERED KICKBACKS FOR HANJ/HSI'S
      RECOMMENDATIONS TO NEW JERSEY PATIENTS
      WHILE MAKING CLAIMS FOR PAYMENT TO THE
      GOVERNMENT ON NEW JERSEY PATIENTS .......... 1

      A.    The Facts Support Greenfield's Allegations That
            Accredo Paid Kickbacks For Recommendations
            While  Submitting False Claims For New Jersey
            Medicare Patients.................................................. 3

            1.    Essentially All Hemophiliacs in New Jersey Are
                  HANJ  Members, And Are Receptive To Its
                  Recommendations........................................... 4

            2.    HANJ Provided Substantial Grants to New Jersey
                  HTCs With Funds Received From Accredo.  These
                  HTCs Were The Location In Which All New Jersey
                  Hemophilia Patients Received Their Healthcare
                  Services......................................................... 6

            3.    HANJ's Fee for Services Arrangement Required
                  Accredo To Make Payments For New Jersey
                  Recommendations In Order To Be Named An HSI
                  Approved Vendor........................................... 8

            4.    HANJ's Recommendations Were Important to Its
                  Members........................................................ 10

            5.    Accredo's Return on Investment Analysis Confirms
                  that Accredo's Kickback Payments and HANJ's
                  Recommendations of Accredo Services to Its New
                  Jersey Members, Occurred At The Same Time That
                  Accredo Was Submitting False Claims for the New
                  Jersey Federal Beneficiaries........................ 12

B.    The False Claims Act Requires Evidence That Accredo Violated The Anti Kickback Statute While Submitting False Claims For New Jersey Federal Beneficiaries, Not Evidence Of Causation............................................    15

1.    Greenfield's Evidence  Shows That False Claims Submitted For Payment Were Connected To The Kickbacks, Because Accredo Was Paying Kickbacks For New Jersey Business While Submitting False Claims To Medicare For New Jersey Patients ..............................................    18

2.    The AKS Does Not Require A Finding Of Criminal Intent Under The FCA.................................    23

III.    CONCLUSION.................................................................    27

# TABLE OF AUTHORITIES

<u>Caselaw</u>

*ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, (9th Cir. 2000), cert. denied,  531 U.S. 1051 (2001)......................................... 24, 25

*Beverly Cmty. Hosp. Ass'n v. Belshe*, 132 F.3d 1259 (9th Cir. 1997), cert. denied 525 U.S. 928 (1998).......................... 25

*Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 130 S.Ct. 1396 (2010)......................................... 25

*Hanlester v. Shalala, Secretary of the Department of Health and Human Services,* 51 F.3d 1390 (9th Cir. 1995)......... 24, 25, 27

*In re Pharma. Indus. Average Wholesale Price Litig.*, 491 F.Supp.2d 12, (D. Mass. 2007)............................................................ 19

*Mason v. Medline Indus.*,731 F.Supp.2d 730 (N.D.Ill.2010)... 22

*McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256 (11th Cir. 2005)........................................ 19

*Rock Island, A. & L.R. Co. v. United States,* 254 U.S. 141 (1920) ......................................................................................... 21

*U.S. v. Baystate Ambulance & Hosp. Rental Service*, Inc., 874 F.2d 20, (1st Cir. 1989)..................................................... 26

*U.S. v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998).................. 25

*U.S. v. Jain*, 93 F.3d 436 (8th Cir.1996), cert. denied, 520 U.S. 1273 (1997)................................................................... 25, 26

*U.S. v. Starks*, 157 F.3d 833 (11th Cir. 1998)........................... 25

*U.S. ex rel. Bartlett v. Ashcroft*, 39 F. Supp. 3d 656 (W.D. Pa. 2014)................................................................ 21

*U.S. ex rel. Hutcheson v. Blackstone,* 647 F.3d 377 (1st Cir. 2011) ..................................................... 22

*United States ex rel. Kester v. Novartis Pharma. Corp.*, 41 F.Supp. 3d 323 (S.D.N.Y. 2014).................................... 19

*U.S. ex rel. Kosenske v. Carlisle HMA, Inc.,* 554 F.3d 88 (3d Cir.2009)........................................................ 19

*U.S. ex rel. Kroening v. Forest Pharm., Inc.*, 155 F. Supp. 3d 882 (E.D. Wis. 2016)................................................ 22

*U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am.*, 565 F.Supp.2d 153 (D.D.C.2008)............................................ 19

*U.S. ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432 (3d Cir. 2004)................................................................ 23

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir.1997)..................................... 19

*U.S. ex rel. Wilkins v. United Health Group*, 659 F.3d 295 (3d Cir. 2011)....................................................16, 17, 21

## Statutes

The Anti-Kickback Statute (AKS), 42 U.S.C. §1320a-7b..... 1, passim

The False Claims Act, 31 U.S.C. § 3729 et seq...................16, passim

The Patient Protection and Affordable Care Act of 2010("PPACA"), Pub.L. 111-148, 42 U.S.C. § 18001................................. 24, 26

## Federal Register

56 Fed.Reg. 35952, 35955 : Medicare and State Health Care
Programs: Fraud and Abuse; OIG Anti–Kickback Provisions
(July 29, 1991)................................................................    21

## Congressional Record

155 Cong. Rec. S10852 at S10853 (Oct. 28, 2009) (Statement
of Senator Kaufman)........................................................  26, 27

Steven Greenfield files this Reply Brief, as the District Court's Opinion erred in placing a requirement of a causal link between Accredo's kickback and its submission of false claims for New Jersey beneficiaries.  Greenfield agrees with the United States' view of the appropriate connection required under the Antikickback Statute.  In this Reply Brief, Greenfield sets out the reasons why the District Court's Opinion is wrong, and Accredo's arguments in support of that Opinion are without factual or legal support.

## I.    ACCREDO OFFERED KICKBACKS FOR HANJ/HSI'S RECOMMENDATIONS TO NEW JERSEY PATIENTS WHILE MAKING FALSE CLAIMS FOR PAYMENT TO THE GOVERNMENT FOR NEW JERSEY PATIENTS.

Accredo's Medicare claims submissions to the Government, for New Jersey patients, are connected to its payments for recommendations to the Hemophilia Association of New Jersey/ Hemophilia Services Inc. ("HANJ/HSI"), and therefore violate the Anti-Kickback Statute (AKS).  While the facts in this case do not present the classic kickback scenario, the connection between the kickbacks and false claims are obvious, because the defendant was making claims to Medicare while participating in a kickback scheme.

The AKS specifically recognizes arrangements that are *"indirect"* or *"covert"*[1] violate the AKS if one purpose of the payments is to induce recommendations or referrals. The relevant connections here involve the relationships and arrangements in the New Jersey hemophilia healthcare marketplace between Accredo, HANJ/HSI, the Hemophilia Treatment Centers[2] (HTCs) and the patients.

The United States ("Government") correctly asserts in its Amicus Brief that the District Court erred in requiring a "causal connection" between the kickbacks and claims for payment. As succinctly argued by the Government, Greenfield needs only show a *"connection between the alleged kickbacks paid by Accredo to the charities and the claims*

---

[1] The relevant parts of the AKS, found at §1320a–7b(2) states [W]hoever . . . offers or pays any remuneration (including any kickback, bribe, or rebate) *directly or <u>indirectly,</u> overtly or <u>covertly</u>*, in cash or in kind to . . . (A) refer an individual to a person for the furnishing or arranging for the furnishing of any item or service . . . or (B) recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under title XVIII [42 U.S.C.A. §§ 1395 et seq.] [emphasis added]

[2] A State-designated hemophilia treatment center (HTC) represents a comprehensive team of disciplines for hemophilia patients. [JA 896; 623- 625]. Included Newark Beth Israel, St. Michael's and/or St. Vincent's, Robert Wood Johnson and Children's Hospital of Philadelphia

*submitted for beneficiaries."* [ Government Amicus ("Amicus") at 8-9].

The AKS expressly allows this connection to be *"indirect"* or *"covert." Id*

### A.    The Facts Support Greenfield's Allegations That Accredo Paid Kickbacks For Recommendations While  Submitting False Claims For New Jersey Medicare Patients.

The facts as contained in Greenfield's Motion for Summary

Judgment support his allegations that Accredo paid kickbacks for

recommendations, while submitting claims for Medicare payment on

New Jersey Hemophilia patients.  The District Court failed to assess

the facts, apply the correct legal standard, and properly assess the

connection between the statutes.  This task is a fact intensive analysis

that  requires an understanding of the market, the conduct and role of

these parties, and the context in which the transactions occurred.

There are only approximately 646 hemophilia patients in New

Jersey, and virtually all are HANJ members because of the historic and

central role it plays in providing a wide range of services[3] to the

---

[3]  HANJ's case management services consist of (i) direct financial support, (ii) counseling and support groups, (iii) outreach and networking services, (iv) programs for children, scholarships and

Hemophilia population in New Jersey.  Accredo dominated the New

Jersey market, having 401 of 646, or 62% of the hemophiliac customers

in 2011. [JA 620]  Medicare costs for hemophilia care average $217,000

per year for each beneficiary. [JA 622].  Accredo is the nations largest

specialty pharmacy provider based on reported revenue. [JA 52].

In 2008, Accredo's contributions to 112 different organizations

totaled  $1,406,700.  HANJ and HSI, small non profit associations with

approximately 800 - 900 members[4], accounted for $440,000.00 of

Accredo's contribution payments,  or more than 31%, nationwide. [JA

140 -1425].  This is no coincidence. At its core, the common denominator

of Accredo's large donations to HANJ is the connection between the

recommendations by HANJ/HSI to its New Jersey membership in

---

homecare delivery program monitoring.  Its advocacy includes (i)
providing literature, (ii) educating the public, (iii) quarterly newsletter,
(iv) website, (v) annual meeting of members, (vi) educational mailings
and (vii) seminars. HANJ's lobbying includes (I) information to State
and Federal legislators, (ii) monitoring new proposed legislation
relating to healthcare, insurance and blood safety, (iii) securing laws
that preserve policies and programs important to the bleeding disorder
community. [JA 626, 938-949]

[4] JA 625

exchange for these substantial payments.[5]   These payments for recommendations, all of which resulted in a distortion of the marketplace, are the very behavior which the AKS was designed to prevent.

1.    **Essentially All Hemophiliacs in New Jersey Are HANJ Members, And Are Receptive To Its Recommendations.**

There were 646 Hemophilia patients in New Jersey in 2011. HANJ has 504 member families, representing 800-900 people with hemophilia as members.  Because Hemophilia is an "inherited" disease, there can be, and are, multiple members within one family.  HANJ Membership has been consistent for several years [JA 925 - 926].  Based on these numbers, virtually everyone in New Jersey who had Hemophilia was a member of HANJ or a member of a household which had a member. This essentially universal membership in HANJ is the first piece of the "connection" between Accredo's payments to HANJ and its false claims submitted for New Jersey Federal beneficiaries.

---

[5] Between 2007 through 2012 these payments totaled $2,246,508 [JA 658 - 669]

2.    **HANJ Provided Substantial Grants to New Jersey HTCs With Funds Received From Accredo. These HTCs Were The Location In Which All New Jersey Hemophilia Patients Received Their Healthcare Services.**

Hemophilia patients typically visit one of the HTCs at least once a year. If a patient undergoes trauma, they could visit an HTC multiple times a year. When patients make their appointment for the yearly exam, they see all of the necessary medical disciplines during the same visit. [See JA 897 - 898]. HANJ/HSI funded substantial grants to the HTCs for research and operating expenses, and provided HTCs with information on the source of the funds.

HANJ and the HTCs had a longstanding relationship, that began more than 15 years ago as a result of the annual grants provided to the HTCs. Between 2007 and 2012, HANJ grants to HTCs totaled between $600,000.00 and $800,000.00 annually for all three HTCs. These grants amounted to between 25% to 42% of each HTC's operating expenses. [See JA 632 - 643; 1041 - 1042].

Each of the HTCs had a list of recommended providers, driven in part from the HANJ list of Approved Providers. [JA 644]. The HTCs provided this information to patients. [JA 907 -908]. HANJ also kept

the HTC's informed as which companies were on the State designated homecare list, but, importantly, made a point to distinguish which of those companies "have been approved as HSI Vendors" and "continually contribute to the community." [See JA 1214 - 1215].

According to Greenfield, the New Jersey HTCs that referred patients to Accredo were Newark Beth Israel, St. Michael's and/or St. Vincent's, Robert Wood Johnson and a New Jersey affiliate of Children's Hospital of Philadelphia [See JA 910 - 911].  Greenfield was told that Accredo received the majority of the referrals from these HTCs [See JA 913-915].  The Accredo sales team understood and believed that HANJ communicated with the HTCs regarding the funding that Accredo provides to HANJ. [See JA 1217 - 1219].

In sum, the HTCs, who provide direct care to the Hemophilia patients, received substantial funding from HANJ annually.  These HTCs also obtain a list of recommended home care providers from HANJ, then share that same list with their patients. In providing the list, HANJ identifies for the HTCs which of them "have been approved as HSI Vendors" and "continually contribute to the community."  In other words, the HTCs know which providers on the list contribute to

HANJ/HSI in amounts large enough[6] to be deemed an "Approved Provider."

HTCs are informed of the source of HANJ grant funds which they receive and rely upon each year for a significant portion of the operating expenses. Bostick, HANJ's Executive Director, acknowledged that *"from time to time, HANJ would let the HTCs know which corporations had donated money."* [JA 1222]. This is the second piece of the "connection" between the Accredo's payment to HANJ for recommendations, and the false claims submitted for payment for New Jersey Medicare beneficiaries.

### 3. HANJ's Fee for Services Arrangement Required Accredo To Make Payments For New Jersey Recommendations In Order To Be Named An HSI Approved Vendor.

The "fees for services" financial arrangement between Accredo and HANJ/HSI was based on Accredo making substantial annual payments. In exchange for these payments, Accredo was designated as an  "HSI

---

[6] HANJ required, in order for a company to reach "Approved Provider" status, a minimum payment of $ 60,000 per year.

Approved Vendor[7]."   HANJ considered these payments a "fee for service." [JA 1224- 1231]. The designation of "HSI Approved Vendor" included recommendations on the HANJ/HSI website (*with "hyperlinks" to the Accredo website*). [JA 651-652]. In addition to its website, HANJ communicated the names of the  homecare companies which were "Approved Vendors" or "Approved HSI Providers," including HHS and Accredo, to its New Jersey members, HTCs, and the State of New Jersey.   [JA 634- 635, 651].

It is common for a nonprofit to appropriately recognize or publicly thank donors via their website. However, demanding significant payment and, in return providing not only recognition on their website, but *hyperlinks* on the website, are recommendations.  Websites  solely

---

[7]  HANJ created an "HSI Approved Provider" or "Approved Vendor" program that gave enhanced status only to those home care providers that agreed to pledge a minimum of $60,000 per year, or more, to HANJ/ HSI, based on the provider's "presence in the community." "Presence in the community" meant how many companies the provider acquired, how many contracts it had with insurance companies, and/or how big the business was growing.  Bostick testified that the home care companies knew this expectation of a minimum donation coming in to the program . The pledge was increased when the provider experienced significant growth. [See JA 628-629; 651] HANJ considered these payments a "fee for services." [JA 1224-31].

devoted to providing support for patients with a particular disease,  like

hemophilia, that then designate some providers as better than others

(thus "Approved"), and request its members to "work with" the

Approved Providers, offering hyperlinks back to the vendor's website,

demonstrates a connection that is far in excess of thanking the donor.

This is a connection between  payments for recommendations and the

Federal beneficiaries. This is the third piece of the "connection" between

Accredo's payments to HANJ for recommendations, and the false claims

submitted for New Jersey Federal beneficiaries.


### 4.    HANJ's Recommendations Were Important to Its Members.

HANJ and HSI are influential advocates in New Jersey, and

providers of services and resources to the Hemophilia community in

New Jersey.  HANJ/ HSI provides a central resource for all available

patient services, and  sponsors insurance and HTC grant programs that

provide access to healthcare for New Jersey hemophiliacs.

Accredo recognized its influence, and used it to gain advantages.

Diana Florio, an Accredo Vice President and its Rule 30(b)(6) deposition

representative, acknowledged *"it is in our best interest to maintain a good relationship"* with HANJ because *"HANJ can influence referrals from the HTCs."* [JA 676-677; 1651-1652].  Accredo knew that, more than a "good relationship,"  HANJ's influence with its members directly it impacted Accredo's business.  For instance, at a meeting held on December 19, 2011,  Accredo officers Bruce Scott,  Diana Florio,  Kirk Cothum, Accredo President Craig Mears, and Greenfield discussed the financial impact Accredo's cuts in funding had caused.  Mears stated

> . . . Let me Start with a summary on what has happened so far. ***Last year our contribution was cut in half from $500,000 to HSI. We communicated the change and they told their patients. We then saw a decline in business. . . .*** [emphasis added]. [JA 674, 1643-1644]

This is the fourth piece of the "connection" between Accredo's kickback payments to HANJ and the false claims submitted for New Jersey Federal beneficiaries. When Accredo cut or stopped its flow of money to HANJ, HANJ affirmatively retaliated against Accredo, and ultimately negatively affected Accredo's business.

5.    **Accredo's Return on Investment Analysis Confirms that Accredo's Kickback Payments and HANJ's Recommendations of Accredo Services to Its New Jersey Members, Occurred At The Same Time That Accredo Was Submitting False Claims for the New <u>Jersey Federal Beneficiaries.</u>**

Greenfield's claims of a connection between the kickbacks paid by Accredo to HANJ/HSI, and Accredo's submission of false claims for New Jersey Federal beneficiaries have been confirmed to be true. Mark Twain, one of our nations foremost authors, is credited with saying "*actions speak louder than words, but not nearly as often.*" When Accredo notified HANJ, by letter dated December 6, 2010, of a cut in its payments, from $350,000 in 2010 to $175,000 in 2011[8], the actions of the parties spoke loud and clear as to the nature of the connection between Accredo's payments and the New Jersey Federal false claims submitted for HANJ member/beneficiaries.

Almost immediately, HANJ went into action. First, a new "Approved Provider" competitor was added to the list.  In February, 2011, HANJ  publicized this new Provider, Bleeding Disorders Resource Network ("BDRN"), recommending this provider as a new alternative

---

[8] JA 666; 1514

for its members.  [See JA 1152, 1518]. Second, on March 23, 2011,

identical letters[9] by HANJ and HSI were sent to their respective

memberships.[10] These letters stated as follows:

● One of our key providers **(HHS/Accredo)** has continued to
significantly reduce its financial support for this program over the
past two years. . . . Policies for our patient population in 2010
alone, approached **one million dollars**. [*emphasis is as shown in
letter*]

● However, I am writing to advise you that, beginning January
2011, HHS/Accredo has chosen to reduce its "financial support" <u>so</u>
<u>significantly</u> that as a "major" participant, this reduction has placed the
Insurance Program in jeopardy of being "phased out" and ceasing to
exist in the foreseeable future. [*emphasis is as shown in letter*].

The letters then continued with a "call to action" as follows:

. . . If you are a **client of HHS/Accredo** or a **participant in
HSI's Insurance Program**, on behalf of the HSI [HANJ] Board, I
request that you <u>IMMEDIATELY</u> contact Craig Mears, President
of HHS/Accredo at the following address: Accredo's Hemophilia
Health Services, 201 Great Circle Road, Nashville, TN 37228 or by
calling 615-850-5079 his office phone or 615-320-3114 his
blackberry. . . . the continued success of the HSI Program depends
upon your continued support and participation. [*emphasis is as
shown in letter*]

---

[9] See JA 15522 - 1526

[10] According to Elena Bostick, HANJ has 504 families representing
800- 900 people with hemophilia as members, as hemophilia is usually
a hereditary disease [ JA 1528 - 1531].

Third, Bostick (Executive Director of HANJ and HSI) immediately sent a copy of this member letter via email on March 23, 2011 to several people at the HTCs, including Dr. Claire Phillipp, M.D. at RWJ Medical Center HTC (who, at the time, acted and is identified as a Medical Advisor to HANJ), Gurn Gunwant from Saint Michaels HTC, and Dr. Alice Cohen and Nurse Ellen White, in which she stated: "*The attached is self explanatory. HHS/Accredo has behaved despicably, while enjoying the fruits of HANJ's labor. Please read. You may receive calls, or other inquiries from your patients . . .*" [JA 669; 1533]

Accredo received approximately 75 letters of complaint from its patients who were HANJ or HSI members, between March 2011 and May 2011. [see copies of these letters (with patient names redacted) JA 1540- 1620].    As the letters were coming in, Frank Sheehy, Accredo President, tasked Craig Mears with researching, inter alia, (i) what type of increase would make HANJ "happy," (i.e., stop HANJ from publishing negative comments about Accredo) (ii) the quantifiable return on investment (ROI) if Accredo restored its contributions to $350,000 and (iii) the "likely business deterioration" if Accredo did not increase its payments. [JA 1622-23].    Greenfield's research confirmed

-14-

Accredo's decline in business as a result of decreased payments to

HANJ, as Accredo President Mears had reported at a meeting held on

December 19, 2011 with Accredo officials Bruce Scott, Diana Florio,

Kirk Cothum, and Greenfield. [Id. at JA 674, 1643-1644].   It is no

coincidence that soon thereafter, Accredo agreed to restore its funding

to the 2010 level of $350,000.00. [JA 673; 1638 - 1642]

The actions by the parties, in the words of Mark Twain, speak

loud and clear as to what they intended and understood: that there was

a connection between Accredo's payments to HANJ for

recommendations to New Jersey patients, and the claims Accredo

submitted for New Jersey Federal member/beneficiaries.

### B.  The False Claims Act Requires Evidence That Accredo Violated The Anti Kickback Statute While Submitting False Claims For New Jersey Federal Beneficiaries, Not Evidence Of Causation.

Kickbacks in the Medicare program are unlawful because the

Government should only have to pay "for conflict-free medical care that

is provided in the best interests of the patient."  Amicus, at 9.

Greenfield  has argued, and proven, that the requisite connection exists

-15-

between Accredo's payment of kickbacks to HANJ (and its sister organization, HSI) for recommendations to its New Jersey members, and Accredo's submission of false claims for New Jersey Medicare hemophilia patients.  Accredo violated the AKS while submitting false claims for New Jersey Federal beneficiaries.  Greenfield's evidence necessitates that the District Court's Opinion be overturned.

The False Claims Act, 31 U.S.C. § 3729 et seq.,  does not require proof of causation, as demanded by the District Court and argued by Accredo. Such level of proof is in direct conflict with this Court's Opinion in *U.S. ex rel. Wilkins v. United Health Group*, 659 F.3d 295 (3d Cir. 2011).  No statute or case law related to the FCA or the AKS requires a causal link between Accredo's funding of HANJ and Accredo's New Jersey patients.  Evidence shows that (1) Accredo is an Approved Provider because it paid a kickback; (2) Accredo knew it had to pay a kickback in order to get New Jersey business and HANJ's recommendation to New Jersey patients; (3) HANJ recommended Accredo to its New Jersey patients;  (4) HANJ's member/patients received the message; and (5) Accredo submitted claims for New Jersey patients while it was paying the kickbacks.

-16-

"A claim for reimbursement for medical care that was not provided in compliance with the AKS is "false" . . .  regardless of whether the violation of the AKS caused the claim." Amicus, p. 6.  The District Court's creation of a new FCA and AKS evidentiary requirement is clear error, and must be overturned.

Other than the court below, every AKS decision of this Circuit, and all of the other Circuits, has held that the FCA and the AKS require a connection, not evidence of causation, between the kickback violation and the false claims submitted. Courts decline to require evidence of causation because kickbacks are, per se, false and fraudulent.   As this Court confirmed in *Wilkins*, a knowing violation of the AKS while submitting claims for payment is a False Claims Act violation.  *Id.*, 659 F.3d at 314.

Appellees' Brief in Opposition, supporting the District Court's Opinion, subtlety describes the Opinion as requiring a "link" as opposed to the "direct link" that the District Court required[ See JA 21, requiring Greenfield to show *. . . that each of defendants' claims to the Government for payment was directly linked to defendants' donations to HANJ/HSI."*] The Opinion's requirement of evidence of causation– not a

-17-

"link" or connection or relationship – is simply unsupported by a plain reading of the statute, or any case law, including this Circuit's precedent.

      **1.**    **Greenfield's Evidence Shows That False Claims Submitted For Payment Were Connected To The Kickbacks, Because Accredo Was Paying Kickbacks For New Jersey Business While Submitting False <u>Claims To Medicare For New Jersey Patients.</u>**

Greenfield's Motion for Summary Judgment provides evidence that claims submitted for payment were connected to the kickbacks. Courts that have described the relationship between the FCA and AKS all come to the same conclusion: claims for payment that are "tainted by," "in connection with," or "linked to" an AKS violations are, in and of themselves, violations of the FCA. This Court defines that relationship or connection as the payment of kickbacks while submitting claims for that same business. The defendant's intent– the knowing violation of the AKS– is a connection between the AKS violation and the FCA submission. When Accredo knowingly paid kickbacks for New Jersey business while submitting claims for New Jersey patients, its knowing

intent to violate the AKS is proven.[11]

Compliance with the AKS is a precondition of Medicare payment, to which the lack of compliance creates the false submission of a claim under the False Claims Act  *U.S. ex rel. Kosenske v. Carlisle HMA, Inc.,* 554 F.3d 88, 94 (3d Cir.2009). Courts that have examined the AKS as a false claims have come to the same conclusion.  See, e.g., *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1260 (11th Cir. 2005); *United States ex rel. Kester v. Novartis Pharma. Corp.*, 41 F.Supp.3d 323, 337–38 (S.D.N.Y. 2014); *In re Pharma. Indus. Average Wholesale Price Litig.*, 491 F.Supp.2d 12, 18 (D. Mass. 2007); *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir.1997); *U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am.*, 565 F.Supp.2d 153, 159 (D.D.C.2008).

The definition of connection necessary to relate kickbacks to false claims can be drawn from existing case law, and the words of the

---

[11]Accredo argues in its Brief, at 50, that the AKS requires a finding of criminal intent.  That issue is not properly before this Court, as it was not ruled upon or discussed in the District Court below. However, the AKS does not require a finding of criminal intent in order for Accredo to be found liable for its false submissions.  See, Sect. B.2., *infra.*

statute itself, showing that the relationship between the parties, including the intent to induce, connects the kickback to the submission. Evidence of a connection exists when a defendant "received payment from the Federal health insurance programs despite their knowing violation of the AKS." *Wilkins,* 659 F.3d at 313-4.

The statute provides that "[a] claim that includes items or services **resulting from** a violation of this statute constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g). "The phrase 'resulting from' was intended to indicate that the taint from an illegal kickback remains with an item or service, regardless of when the claim to the federal government is made for the item or service and regardless of who submits the claim." Amicus, at 21. Any submissions for services resulting from an AKS violation are actionable. In this case, Accredo's kickbacks, which intended to induce a recommendation of New Jersey patients, is actionable since those kickbacks did in fact induce a recommendation to New Jersey HANJ members, at the same time that Accredo submitted claims for New Jersey Federal beneficiaries.

The connection between the kickback and the claims submission,

as argued by Greenfield, is supported by FCA case law by this Court.  In

*U.S. ex rel. Wilkins*, this Court examined the interplay of the AKS and

FCA, finding that

> Compliance, however, does require a participant in a federal
> health care program to refrain from offering or entering into
> payment arrangements which violate the AKS, while making
> claims for payment to the Government under that program. We do
> not think this is an unreasonable requirement to impose on
> federal health care contractors, for as Justice Holmes once wrote:
> 'Men must turn square corners when they deal with the
> Government." *Rock Island, A. & L.R. Co. v. United States,* 254
> U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920).

*Wilkins*, 659 F.3d at 314.  When the participant enters into an AKS

violation while making a claim for payment, the requisite connection

exists to prove the falsity of the claims.  After all, a defendant's liability

under the AKS "ultimately turns on the intent of the parties and will

depend on the facts and circumstances present in each case."  *U.S. ex*

*rel. Bartlett v. Ashcroft*, 39 F. Supp. 3d 656, 676 (W.D. Pa. 2014), citing

Medicare and State Health Care Programs: Fraud and Abuse; OIG

Anti–Kickback Provisions, 56 Fed.Reg. 35952, 35955 (July 29, 1991)

("[T]he gravamen of a violation of the statute is 'inducement' and not

necessarily the structure of the arrangement," such that "case by case

inquiries must necessarily focus on the intent of the parties.")

-21-

A district court in Wisconsin found that, in matters of first impression,  FCA issues must be analyzed according to the underlying purposes of the AKS.  That court similarly looked to the intent of the participant when it committed an AKS violation while submitting claims for payment.  "If the pharmaceutical company knows that the violation of the Anti-Kickback Statute will lead to a claim for payment submitted to the government . . . the pharmaceutical company violates the FCA, provided the government would not have paid the claim had it known of the violation." *U.S. ex rel. Kroening v. Forest Pharm., Inc.*, 155 F. Supp. 3d 882, 891 (E.D. Wis. 2016), citing *U.S. ex rel. Hutcheson v. Blackstone,* 647 F.3d 377, 389 (1st Cir. 2011). The *Kroening* court adopted a broad interpretation of the FCA and AKS connections as "most consistent with Congress's intent that the FCA be read broadly 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.' " *Id. at 890-91,* citing *Mason v. Medline Indus.*, 731 F.Supp.2d 730, 738 (N.D.Ill.2010) (citations omitted).

Accredo failed to cite a case that supports its argument on a requirement of a causal "link" between the FCA and the AKS.  In fact,

Accredo 's entire Brief cites cases for propositions that are inapplicable to Accredo 's argument. In Accredo 's most cited case, *U.S. ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432 (3d Cir. 2004), this Court held, in a non-AKS case, that there must be a causal connection between the alleged wrong and "the actual submission of a false claim." *Id.* at 440. But *Quinn*'s non-AKS case holding on causation is inapplicable here.

The only logical link that can exist is between the participant-defendant's intent in offering an inducement, and the participant's submission of claims at the same time it is offering the inducement related to the underlying service. Such link makes the underlying claims submission "tainted" and therefore false.

### 2. The AKS Does Not Require A Finding Of Criminal Intent Under The FCA.

Greenfield has sufficiently proven that Accredo knowingly violated the AKS while submitting claims for payment for New Jersey Federal beneficiaries. The AKS does not require Greenfield to also prove that Accredo's actions were criminal. Accredo's arguments in the alternative, not raised by the court below, must be ignored.

Effective March 23, 2010, Congress amended the AKS to eliminate *Hanlester's* specific intent requirement.[12] *See* Patient Protection and Affordable Care Act of 2010("PPACA"), Pub.L. 111-148, 42 U.S.C. §18001 et seq., effective March 23, 2010.  Subsection(h) of 42 U.S.C. § 1320a-7b now provides that "[w]ith respect to violations of this section, **a person need not have actual knowledge of this section or specific intent to commit a violation of this section.**" [emphasis added] The PPACA eliminates any need for evidence of specific intent.

Congress' 2010 amendment of the AKS clarified that there was never a specific intent requirement in the pre-2010 AKS.  While the PPACA is not retroactive, [*see Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 130 S.Ct. 1396, 1400 n.1 (2010)], the legislative history makes clear that the AKS never required evidence of specific intent.  Subsequent legislation may be considered in construing an earlier statute where there are clear indications that Congress intended to clarify an erroneous court decision construing the statute. *ABKCO Music, Inc. v. LaVere*, 217 F.3d

---

[12]*Hanlester v. Shalala, Secretary of the Department of Health and Human Services,* 51 F.3d 1390 (9th Cir. 1995).

684, 689-92 (9th Cir. 2000), cert. denied, 531 U.S. 1051 (2001)("We have long recognized that clarifying legislation is not subject to any presumption against retroactivity and is applied to all cases pending as of the date of its enactment"); *Beverly Cmty. Hosp. Ass'n v. Belshe*, 132 F.3d 1259, 1265-66 (9th Cir. 1997), cert. denied 525 U.S. 928 (1998) ("Normally, when an amendment is deemed clarifying rather than substantive, it is applied retroactively" as"a decision by the current Congress to intervene by expressly clarifying the meaning of [the earlier statute] is worthy of real deference.").

The Ninth Circuit's requirement of specific intent to violate the pre-2010 AKS in *Hanlester* was contrary to the decisions of four other circuits, which held that no such showing was required. The other circuits held that to violate the AKS the defendant had only to know that his conduct was generally wrongful. See, e.g., *U.S. v. Starks*, 157 F.3d 833, 837-39 (11th Cir. 1998) (knowledge of the statute is not required for an AKS violation); *U.S. v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *U.S. v. Jain*, 93 F.3d 436, 439-41 (8th Cir.1996), cert. denied 520 U.S. 1273 (1997) (intent requirement of AKS "should only require proof that [the defendant] knew his conduct was wrongful, rather than

proof that he knew it violated a 'known legal duty'"); *U.S. v. Baystate Ambulance & Hosp. Rental Service*, Inc., 874 F.2d 20, 33 (1st Cir. 1989) (under the AKS "knowingly" simply means to do something voluntarily or deliberately, not by mistake or accident; and that "willfully" means to do something purposely, with the intent to violate the law, or to do something purposely that the law forbids).

Congress's 2010 amendment of the AKS is consistent with the pre-2010 majority view that a defendant may violate the AKS even if he does not have actual knowledge of, or a specific intent to violate, the statute. The legislative history of PPACA  specified that the AKS amendment was intended to clarify the Ninth Circuit's erroneous interpretation:

> The bill also addresses confusion in the case law over the appropriate meaning of "willful" conduct in health care fraud. Both the anti-kickback statute and the health care fraud statute include the term "willfully." In both contexts, the Ninth Circuit Court of Appeals has read the term to require proof that the defendant not only intended to engage in unlawful conduct, but also knew of the particular law in question and intended to violate that particular law. This heightened mental state requirement may be appropriate for criminal violations of hyper-technical regulations, but it is inappropriate for these crimes, which punish simple fraud. . . [The bill] clarifies that "willful conduct" in this context does not require proof that the defendant had actual knowledge of

the law in question or specific intent to violate that law. As a result, health care fraudsters will not receive special protection they don't deserve.

155 Cong. Rec. S10852 at S10853 (Oct. 28, 2009) (Statement of Senator

Kaufman (discussing predecessor bill to PPACA, the Health Care

Enforcement Act of 2009).

Congress has clarified that *Hanlester* erroneously imposed a

specific intent requirement on pre-March 23, 2010 AKS violations, and

that no specific intent is required to prove a pre-March 23, 2010 AKS

violation.

## III.  <u>CONCLUSION</u>

Accredo violated the AntiKickback Statute, by paying kickbacks

for recommendations to New Jersey patients, while at the same time

submitting claims for payment to the Federal government for New

Jersey patient beneficiaries.  The District Court improperly denied

Greenfield's Motion for Summary Judgment, and granted Accredo's

Motion for Summary Judgment.  In particular, the District Court erred

by requiring a "causal connection" or "direct link" between the

kickbacks and claims.  Requiring Greenfield to identify the specific

patients influenced to pick Accredo as a result of the kickbacks for recommendations, is unsupported by the statute, legislative history, and precedent. The FCA does not require this level of proof, nor does the AKS. The District Court's Opinion must and should be reversed.

**RESPECTFULLY SUBMITTED,**

S/ Marc M. Orlow
**BEGELMAN & ORLOW, P.C.**
BY:   Marc M. Orlow

S/ Regina D. Poserina
BY:   Regina D. Poserina
    Ross Begelman
411 Route 70 East, Suite 245
Cherry Hill, NJ 08034
(856) 428-6020
Fax: (856) 428-5485
Email: Marc.orlow@begelmanorlow.com
    regina.poserina@begelmanorlow.com

July 21, 2017

WORD COUNT:     5,392 words.



## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

| | § | |
|---|---|---|
| United States <u>ex</u> <u>rel.</u> Steve Greenfield, | § | On Appeal From An Order |
| | § | of The U.S. District Court |
| APPELLANT, | § | of the District Of New |
| | § | Jersey |
| v. | § | Appeal Docket No. 17-1152 |
| | § | |
| Medco Health Solutions, Inc., Accredo | § | |
| Health Group, Inc., and Hemophilia | § | Civil Action Pursuant to |
| Health Services, Inc., | § | The False Claims Act |
| | § | 31 U.S.C. § 3729 et seq. |
| APPELLEES | § | |
| | § | |

## <u>CERTIFICATIONS OF APPELLANT, STEVEN GREENFIELD</u>

1.    All Attorneys for Appellant Mr. Greenfield are members of the Bar of the United States Court of Appeals for the Third Circuit.

2.    The Word Count for the Reply Brief is in compliance with F.R.A.P. 28(e) and 32(a)(7), in that there are 5,392 words, as obtained by the word counting function of Word Perfect.

3.    The electronic version of the Reply Brief, as filed via ECF, is identical to the paper version served upon the Court, the United States, and the opposing party.

4.    All electronic filings were checked for viruses using Microsoft Security Essentials, before filing.

5.    I do hereby certify that I have caused to be served, via ECF and first class U.S. Mail, postage prepaid, a true and correct copy of

Appellant's Appeal Reply Brief, upon the following:

7 copies:   Office of the Clerk
             United States Court of Appeals for the Third Circuit
             21400 U.S. Courthouse
             601 Market Street
             Philadelphia, PA 19106-1790

1 copy:     Craig Singer, Esq.
             Paul Boehm, Esq.
             Williams & Connolly, LLP
             725 12th Street, NW
             Washington, DC  20005

1 copy:     Charles Graybow, Esq.
             U.S. Department of Justice
             970 Broad Street, Suite 700
             Newark, NJ  07102

RESPECTFULLY SUBMITTED,

   S/ Regina D. Poserina

**BEGELMAN & ORLOW**
BY:   Regina D. Poserina
411 Route 70 East, Suite 245
Cherry Hill, NJ 08034
(856) 428-6020
Fax: (856) 428-5485
Email: regina.poserina@begelmanorlow.com

July 21, 2017